ODOM, Justice.
 

 Defendant was charged with murder, tried, convicted as charged, and sentenced to be hanged. He appealed, and for reversal relies on three bills of exception.
 

 He filed a motion to quash the indictment on the following grounds:
 

 
 *767
 
 . “That the general venire box for the Parish of St. John, did not contain the names of any negro at the time the panel for the Grand Jury was drawn, which returned the Indictment herein against mover; that the officers of the law in charge of said matter not only failed to place in said venire box the names of any negroes qualified to serve as Grand or Petit Jurors but deliberately excluded therefrom the names of any negroes qualified to serve as Grand or Petit Jurors, which action on the part of said officers is a denial of due process of law, and is a violation of movers constitutional rights as granted hifn by the Constitution of the State of Louisiana, of 1921 [article 1, § 2], and specially the Fourteenth Amendment of the Constitution of the United States of America.
 

 “Mover further shows, that he is informed and believes and so avers that there has not been a negro on the Grand Jury or Petit Jury of said Parish for at least 20 years; that the officers of said Parish have systematically, unlawfully and unconstitutionally excluded negroes from the Grand or Petit Jury in said Parish during this period of time; that this exclusion of negroes as Jurors in this Parish is done solely and only because of their race and color and results in a denial to mover of due process of law and the equal protection of the law guaranteed him under the Constitution of the State of Louisiana of 1921, and the Constitution of the United States of America.”
 

 The motion to quash was overruled, and a bill of exception was reserved.
 

 After conviction he filed a motion in arrest of judgment, based on the same grounds as those which formed the basis of the motion to quash. The motion in arrest was overruled, and a bill was reserved.
 

 During the course of the argument, the district attorney said:
 

 “Gentlemen of the Jury — Finally and in conclusion when they call the roll of the damned already inscribed with the name of Dreher and LeBoeuf, Dalleo and Capaci, Eisenhardt and Jamfes, I say to you, make an example of this accused, stamp out cold blooded murder in this Parish by inscribing the name of Hugh Pierre on the roll call of the damned by returning a verdict of guilty as charged.”
 

 Counsel for defendant objected to this language because “said statement was prejudicial to defendant, was entirely outside of the.evidence presented on the trial of said case and was for the sole purpose of prejudicing defendant before the Jury in-making a comparison of the case upon which defendant was being tried with that of cases of banditry and murder.”
 

 Counsel requested the court to instruct the jury to disregard the remarks. The court refused to give the requested instruction, and a bill was reserved to the ruling.
 

 Defendant is a negro and was prosecuted for killing a white man. The motion to quash the indictment and that in arrest of judgment are based upon the same grounds and will be considered together. These grounds were successfully urged by the defendant in the case of Norris v. State
 
 *769
 
 of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074.
 

 In the Norris Case the Supreme Court reaffirmed its ruling in the earlier cases of Carter v. Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839, and in Martin v. Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497, where it was said:
 

 “Whenever by any action of a state, whether through its Legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the' Fourteenth Amendment of the Constitution of the United States.”
 

 In the Norris Case, the court said:
 

 “And although the state statute defining the qualifications of jurors may be fair on its face, the constitutional provision affords protection against action of the state through its administrative officers in effecting the prohibited discrimination.”
 

 It was said by the court in the Norris Case that there was no controversy as to the constitutional principle involved. The same may be said with reference to the case at bar. The constitutional principle which was involved in the Norris Case, and is involved in the case at bar, is that, if the state, either through legislation, through its courts or its executive or administrative officers, excludes from jury service all persons of the negro or African race in criminal prosecutions of the members of that race, solely because of their race or color, the equal protection of the laws is denied the one prosecuted, under the Fourteenth Amendment to the Constitution of the .United States and, in this state, contrary to the Due Process Clause of the Constitution of 1921, article 1, § 2.
 

 We now recognize that principle, as we have always done. This is shown by the following cases: State v. Gill, 186 La. 339, 172 So. 412; State v. Turner, 133 La. 555, 63 So. 169; State v. Baptiste, 105 La. 661, 30 So. 147; State v. West, 116 La. 626, 40 So. 920; State v. Murray, 47 La.Ann. 1424, 17 So. 832; State v. Joseph, 45 La. Ann. 903, 12 So. 934; State v. Lawrence, 124 La. 378, 50 So. 406; State v. Casey, 44 La.Ann. 969, 11 So. 583.
 

 In fact, it is specially provided in the. law prescribing the method of drawing grand and petit jurors to serve in both civil and criminal cases that “there shall be no distinction made on account of race, col- or or previous condition.” Act No. 135 of 1898, p. 216, § 1.
 

 If indeed it be true, as alleged in defendant’s motion to quash the indictment, that members of the negro or African race, who possess the necessary qualifications as jurors, prescribed by the statutes, have been systematically excluded from such service in the parish of St. John, where this prosecution took place, solely because of their race or color, the indictment should have been quashed, and the motion in arrest of judgment should have been sustained.
 

 
 *771
 
 The defendant having based' his motion to quash and his motion in arrest of judgment upon the ground of such illegal discrimination, the burden was upon him to prove the facts alleged. Such has been the ruling of this court for many years. See State v. Murray, State v. Joseph, State v. West, State v. Baptiste, supra.
 

 And such is the ruling of the Supreme Court of the United States. Martin v. Texas, supra. In Bush v. Kentucky, 107 U.S. 110, 1 S.Ct. 625, 631, 27 L.Ed. 354, a motion was made to quash the indictment on the ground of illegal discrimination from jury service of members of the negro race because of their race or color, and, in disposing of this motion, the court said:
 

 “It is sufficient for this assignment to say that the motion was properly overruled, for the reason, among others, that the grounds upon which is was rested do not clearly and distinctly show that the officers who selected and summoned the petit jurors excluded from the panel qualified citizens of African descent
 
 because of their race or color."
 

 In the case at bar, the defendant asked for, and was granted, the privilege of calling, witnesses to support the allegations of his motion to quash. Twelve witnesses were called, including the clerk of court of St. John parish, who is ex officio chairman of the jury commission; the sheriff of the parish; the superintendent of schools; the editor of a local newspaper who had been a census enumerator; a former clerk of the district court — all white, and four colored citizens of the parish. We have reviewed the testimony of 'these witnesses and find that defendant failed utterly to prove his allegations. Not only did he fail to prove that there was discrimination against colored citizens of the parish because of their race or color at the time the grand jury which returned the indictment and the petit jury for that term of court were drawn, but he failed to prove that, as a matter of fact, the names of colored people were not included among the 300 names in the jury box. In fact, the testimony shows that, at the time the grand and petit juries were drawn, the names of at least' four colored people were included in the list of 300 from which the grand jury was selected and the petit jury for that term of court was drawn. Mr. Martin, the clerk of court, said, on examining the general venire list, that there were two, three, or four names of colored people included, and the sheriff of the parish testified that he recognized the names of two or three negroes on the list and that there might be more.
 
 <
 
 Both the clerk of court and the sheriff testified that they were not personally acquainted with all of the male citizens of the parish and' especially the colored citizens, and that, with more time to check the list, they might find more names than those already pointed out. Mr. Martin, the clerk of court, testified that the name of at least one negro was drawn to serve on the petit jury drawn at the same time that the grand jury sought to be quashed was selected. He and the sheriff both said they did not remember whether negroes had served on juries in that parish in former years or not. A colored man named Soraparu tes
 
 *773
 
 tified that he knew a few negroes who had served on juries in that parish. Another colored man named Dinvant testified that he himself had served on a jury in that parish in his “young days,” something like 30 years ago.
 

 The major portion of the testimony introduced by counsel for defendant had reference to the number of adult negro males in the Parish of St. John who could read and write. All other qualifications prescribed by law seem to have been overlooked. The qualifications prescribed are that the person must be a bona fide resident of the parish for one year next preceding such service, not under interdiction or charged with any crime or offense, nor convicted at any time of any crime or offense punishable with hard labor; that he must be able to read and write and be a competent and intelligent person of full age. Under the law, a person of full age may be able to read and write and still not possess the qualifications prescribed by law.
 

 The testimony shows that the population of St. John parish .is between 12,000 and 14,000, and that, of this number, approximately 3,000 or 4,000 are negroes. No witness knew how many negroes above the age of 21 years in the parish of St. John are able to read and write. The witnesses called could do no more than estimate the number. These estimates vary. Mr. Reynaud, who had been editor of a local newspaper, testified that only two negroes were subscribers for his paper. He said that he was at one time a census enumerator and that in his opinion there were not more than 75, and probably not over 50, negro men in the parish who could read and write. (Under the Constitution, women cannot be called for jury service unless they express in writing a willingness to serve. As a matter of fact, they are never called.)
 

 Mr. Brou, former clerk of court, testified that in his opinion there were not more than 100 negroes in the parish qualified to serve as jurors. The colored'man Soraparu stated that, according to his estimate, there were probably 150 adult negroes in the par-' ish who could read and write. The other colored men called stated that they knew a few colored adults who could read and write, but they did not pretend to state how many of that class lived in the parish.
 

 Mr. Montegut, superintendent of public schools, testified that the population of the parish was approximately 14,000 and of that number possibly 3,000 were members of the colored race. On being questioned as to his opinion of the number of colored men in the parish between the ages of 21 and 65 who possessed the qualifications as jurors, he stated that there were possibly 25 or 50. He said that his estimate was purely a guess. In fact, the testimony of all the witnesses as to the number of those qualified for jury service was “guesswork.”
 

 ; As we have said, there were at least four and possibly more names of colored citizens on the jury roll of 300. If there are no more than 75 or 100 colored males between the ages of 21 and 65 in the parish who can read and write — and when we consider that some of these may have been disqualified from jury service on one or more of the grounds stipulated in the act of the legislature — the names of 4 negroes out of 300
 
 *775
 
 names on the j-ury roll do not seem disproportionate to the number of whites, and does not, we think, indicate that there was discrimination against the colored race.
 

 Certain it is that the testimony fails to show that there was ever any intentional discrimination against the colored race because of their race or color. The law makes it the duty of the jury commissioners to select men for jury service who are competent and intelligent. They must take into consideration the qualifications prescribed by law. In selecting the names to be placed on the jury roll, the members of the jury commission naturally select the names of those whom they know to be qualified or who they think possess the proper qualifications. It is not their duty to search the parish for members of the colored race who possess the proper qualifications merely in order that-there be the names of such persons on the roll. The Supreme Court of the United States has held more than once that a member of a certain race is not entitled as a matter of law to be tried by the members of his own race. Bush v. Kentucky, Martin v. Texas, supra. In the former case; 107 U.S. 110, 1 S.Ct. 625, at page 631, 27 L.Ed. 354, the court said:
 

 “There was no legal right in the accused to a jury composed in part of his own race. All that he could rightfully demand was'a jury from which his race was not excluded
 
 because of their color.”
 
 Citing Virginia v. Rives, 100 U.S. 313, 323, 25 L.Ed. 667.
 

 What the law prohibits is a discrimination against the negro or African race because of color or previous condition. In the case at bar, there is nothing to show discrimination, and therefore the refusal of the court to quash the indictment and to sustain the motion in arrest of judgment was correct.
 

 The other bill of exception relied on by counsel for defendant was reserved to the refusal of the court to instruct the jury to disregard the remarks made by the district attorney in argument, which remarks we have already quoted. While the language used by the prosecuting attorney was strong and emphatic, yet, under numerous rulings of this court, the verdict of the jury should not be set aside because of them. Under the uniform jurisprudence of this state, while such language used by a prosecuting attorney may be objectionable, it does not constitute reversible error if the evidence brought out in the trial is such as to warrant the assertions made and where it does not clearly appear that the jury was influenced by such remarks. State v. Clayton, 113 La. 782, 37 So. 754; State v. Williams, 107 La. 789, 32 So. 172; State v. Forbes, 111 La. 473, 35 So. 710; State v. Jones, 51 La.Ann. 103, 24 So. 594; State v. Young, 114 La. 686, 38 So. 517.
 

 The cases of State v. Dreher and LeBoeuf, 166 La. 924, 118 So. 85; State v. Daleo, 179 La. 516, 154 So. 437; State v. Capaci, 179 La. 462, 154 So. 419; State v. Eisenhardt and James, 185 La. 308, 169 So. 417, referred to by the district attorney, are matters of history in this state. The defendants in those cases were found guilty of murder and were hanged. In the cases of State v. Dreher and LeBoeuf, 166 La. 924, 118 So. 85, and of State v. Genna, 163
 
 *777
 
 La. 701, 112 So. 655, this court held that a reference to such celebrated cases as the Loeb-Leopold and the Gray-Snyder Cases did not constitute reversible error.
 

 There were other bills of exception reserved by counsel for defendant, but they seem to have been abandoned, as they were not discussed in oral argument before the court and are not in counsel’s brief.
 

 For the reasons assigned, the judgment appealed from is affirmed.